UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


RTR TECHNOLOGIES, INC.,          )
ROSALIE BERGER, AND CRAIG        )
BERGER,                          )
          Plaintiffs             )
                                 )
               v.                )   C.A. No. 09-cv-30189-MAP
                                 )
CARLTON HELMING and HELMING      )
& CO., P.C.,                     )
          Defendants             )


MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT &
PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR REPLY
(Dkt. Nos. 22 & 33)

September 19, 2011

PONSOR, S.J.


I.   INTRODUCTION

     The background of this case is unusual and, to some

extent, disturbing.  Plaintiffs managed for many years to

enjoy over $1,000,000, tax-free, by claiming on their tax

returns that this money was a "loan" from a Subchapter S

corporation they controlled, rather than income.  When

Defendants, an accounting firm, advised them to amend the

return to recognize these funds as income, Plaintiffs

followed the advice and incurred a tax liability.  Now
Defendants find themselves sued for this allegedly negligent
advice.

More specifically, in their six-count complaint,
Plaintiffs RTR Technologies, Inc., Rosalie Berger, and Craig
Berger allege that Defendants Carlton Helming and Helming &
Co., P.C. provided the negligent tax preparation advice.
The primary target of Plaintiffs' complaint is Defendants'
recommendation that Plaintiffs revise their 2002 personal
and corporate tax returns to re-classify a one-million-
dollar "Loan to Officer" entry as income to RTR's president
and sole owner, Ms. Berger.  Defendants contend that this
correction was necessary because, in their view, the "Loan
to Officer" was clearly not a bona fide loan given its size
and history, RTR's lack of documentation on the loan, the
absence of a repayment plan, and the Bergers' admitted
inability to pay back the loan.  Plaintiffs contend that the
tax return revision was neither necessary nor prudent and
resulted in substantial tax liability and lost profits.

For the reasons stated below -- chiefly, Plaintiffs'
failure to file the complaint within the prescribed

statutory period, to produce evidence of damages, and to demonstrate that Defendants' advice was negligent -- Defendants' Motion for Summary Judgment (Dkt. No. 22) will be allowed. Plaintiffs' Motion for Leave to File Sur Reply (Dkt. No. 33) will be denied.

## II.  FACTS

Viewed in a light most favorable to the non-moving parties, Plaintiffs in this case, the relevant facts are as follows.

## A.  The Parties.

Plaintiff RTR Technologies, Inc. ("RTR" or "the company") is a Subchapter S corporation. It was incorporated in Massachusetts in 1994 to provide heating systems for rail and mass transit. RTR's sole owner and president is Plaintiff Rosalie Berger. Plaintiff Craig Berger is an RTR employee and husband of Rosalie Berger. His focus at RTR is in business and product development, engineering, and sales.

Defendant Helming & Company, P.C. ("H&C") is a business consulting and public accounting firm with a principal place of business in Connecticut. Defendant Carl Helming is

president of H&C and is certified as a public accountant, turnaround professional, insolvency reorganization advisor, and valuation analyst.

B.   RTR's Financial Crisis.

RTR ran into financial difficulties in part as a result of the tragic events that unfolded in the United States on September 11, 2001.  The company had been granted a large purchase order from the Long Island Railroad, which suffered from a significant drop in ridership following the 9/11 disaster in New York.  The decrease in business substantially reduced the size of its purchase order from RTR.  This chain of events, combined with a roughly $600,000 delinquency in monies owed to suppliers, created a severe strain on RTR's resources.  RTR was temporarily unable to operate, and it could not pay its vendors or creditors, including the Internal Revenue Service ("IRS").

Consequently, in October 2002, at Ms. Berger's direction, RTR applied for a loan through the Small Business Administration ("SBA").  The SBA had previously granted RTR two loans in 1997 and 1998 for $425,000 and $300,000, respectively.  The SBA thereafter granted RTR's third loan

application, titled Economic Injury Disaster Loan ("Disaster Loan"), in the amount of $687,500.  The Disaster Loan stated that RTR could not "pay" or "make any distribution" or "make any advance, directly or indirectly by way of Loan, gift, bonus or otherwise to any other company, or to any officer, director or employee of [RTR], or of any such Company." (Dkt. No. 22, Ex. 62.)

Despite this influx of capital, the company's financial problems continued, and it was unable to make payment on its loans from the SBA.  In 2002 and 2003, RTR made additional requests to obtain loans from the SBA, which were denied.  In his denial letter, the SBA loan officer noted that the company had "continued to loan the principals funds" and that "these funds represent valuable financial resources which could have been applied to the recovery effort following the disaster." (Dkt. No. 22, Ex. 16.)  RTR then entered into a forbearance agreement with the SBA that required it to employ a turnaround manager to help it recover from its financial difficulties.  That agreement was extended a number of times, at least through July 2005, and also included a prohibition on loans, payments, or advances

to related parties such as the individual plaintiffs here.

C.  <u>Plaintiffs Retain Philip + Company, Inc. to Provide
    Turnaround Services</u>.

In 2003, Ms. Berger retained Philip + Company ("P+C"),
a turnaround management firm, to help address the company's
financial woes.  In an engagement letter dated May 19, 2003,
P+C observed that RTR suffered from a high level of long-
term debt, that the company would experience a working
capital shortfall of at least $340,000 by year-end, and that
the company was "at risk of failure."  (Dkt. No. 22, Ex.
20.)

The letter also noted that "the balance sheet includes
Loans to officer and related entities totaling $1.37
million." (<u>Id.</u>)  Upon analysis, it emerged that between 1994
and 2003, Ms. Berger withdrew varying sums of money from
RTR's accounts, which were recorded as a "Loan to Officer"
on the company's books.  RTR's balance sheet as of December
31, 2002, indicated that the Loan to Officer account totaled
$1,008,966.42.[1]  (Dkt. No. 22, Ex. 11.)  During this time,

---

[1] The ledger actually reads "Loan -- Officer," but, for
stylistic reasons, this court refers to it as a "Loan to
Officer."

RTR also provided substantial loans to three related companies, Transcom, NYBB, and Catbird Seat, LLC ("Related Party Loans"), all of which were owned by Ms. Berger and/or her husband. P+C's engagement letter concluded that "[t]he recovery of these loans is doubtful." (Dkt. No. 22, Ex. 20, at 2.)

A month later, in June 2003, P+C produced a financing profile for the company, which described the loans to Ms. Berger and RTR's related entities as "a burden on RTR resources." (Dkt. No. 22, Ex. 21, at 3.) It also provided that "RTR can no longer be the source of cash for related party activities, or for supplementing personal lifestyle costs" and, accordingly, suggested fixing the salaries of Rosalie Berger and Craig Berger at $104,000 and $90,000 respectively. (Id. at 13.) An accompanying letter explained:

> [T]he primary reason for [RTR's] current financial circumstances is inadequate financial management, and in particular the investment in the Stockbridge office and the advances to related parties . . . [which] have drained in excess of $880,000 from the business.

(Dkt. No. 22, Ex. 22, at 1.) Further, "as a fundamental

matter, if the Company had even a portion of the $880,000, its circumstances would be markedly different." (Id.) P+C then emphasized the need to limit Ms. Berger's involvement in the active management of the company, suggesting that "her value [to RTR] will only be realized . . . if she withdraws from the day-to-day affairs of the Company and focuses on the strategic level of the business." (Id. at 2.)

Perhaps unsurprisingly, Plaintiff Rosalie Berger responded to P+C by letter on August 18, 2003, terminating their business relationship. She explained that P+C's "most major flaw was underestimating my value to the company, and their systematic approach to reduce, and/or even eliminate my involvement." (Dkt. No. 22, Ex. 27.)

D. **Plaintiffs Retain Defendants Helming and H&C.**

On September 25, 2003, Plaintiffs entered into an agreement with Defendants ("the 2003 Agreement") in which Defendants agreed to replace P+C as RTR's turnaround manager. (See Dkt. No. 22, Ex. 26.) Defendants were initially hired only to provide business turnaround advice for the company and not to provide tax preparation services,

8

as Plaintiffs had retained another accountant, Weinstein &

Anastasio, to perform their tax-related services until 2005.

Ms. Berger explained that they hired Defendants "to level

us, to stabilize us, to stop the bleeding, to protect us

from any creditors or taxing authorities . . . ."  (Dkt. No.

22, Ex. 3, R. Berger Dep. 93:19-21.)  Through a series of

subsequent agreements, however, Defendants contracted with

Plaintiffs to provide tax preparation services as well.[2]

(Dkt. No. 22, Exs. 31, 57.)

Defendant Helming, like P+C, became concerned about

payments to Ms. Berger being carried on the company's books

as a loan.  In Defendant Helming's opinion, "there were no

---

[2] The 2003 Agreement contained, among other things, a
provision limiting Defendants' liability such that Plaintiff
RTR would indemnify Defendants for all damages arising from
services provided pursuant to the 2003 Agreement, excluding
damages arising from gross negligence or willful misconduct.
(See Dkt. No. 22, Ex. 26, Appx. B.)  It also contained a
provision limiting liability to the lesser of Defendants'
fees or $100,000.  (See Dkt. No. 22, Ex. 26, Appx. A.)  A
subsequent agreement dated February 16, 2005, contained an
identical provision limiting liability to $100,000, but it
did not contain an indemnification clause.  (Dkt. No. 30,
Appx. A.)  The parties argue at some length about which
contract governs this case and about the enforceability of
the various contractual provisions limiting recovery.  For
reasons discussed below, the court need not resolve these
issues.

loans.  There were no documents, no attributes of any loans

whatsoever.  They were just surreptitious . . . advances

that were taken through the years and that we inherited."

(Dkt. No. 39, Ex. 4, Helming Dep. Vol. I 171:12-18.)

Defendant Helming reached this conclusion after viewing the

company's balance sheets and the Bergers' personal finances,

and after Ms. Berger "expressed to me countless times she

had no ability to repay."  (Dkt. No. 39, Ex. 5, Helming Dep.

Vol. II 75:3-5.)  As for the impact on the company, he

explained:

> [I]t's a turn around situation.  The company has
> got to marshal all of its assets.  These advances
> or alleged loans or whatever you want to call them,
> I couldn't collect them.  There was no substance to
> them whatsoever.

(Dkt. No. 39, Ex. 4, Helming Dep. Vol. I 213:3-9.)

Accordingly, Defendant Helming determined that

Plaintiffs' previous accounting firm, Weinstein & Anastasio,

had improperly advised them to treat these monies as loans.

He further concluded that Plaintiffs should file amended

personal and corporate tax returns for 2002 to reclassify

the "loans" as income.  Defendant Helming stated at his

deposition that he had three primary considerations in mind

when he advised Plaintiffs to amend their tax returns: (1) a potential lawsuit against Plaintiffs' previous tax accountant, Weinstein & Anastasio; (2) "cleaning the records up" for the SBA; and (3) the need to maintain accurate balance sheets as turnaround managers.  (Dkt. No. 22, Ex. 4, Helming Dep. Vol. I 177.)

Defendant Helming discussed his concerns regarding the Loan to Officer with Ms. Berger and with RTR's general manager, Sera Daemi, at various times in 2004 and 2005.  In March 2004, Ms. Daemi expressed her own doubts about the recovery of the Related Party Loans: "It would be cleaner to call a spade a spade as we will never see any monies from Transcom.  Plus I am certain the Transcom loan is NOT accurate."  (Dkt. No. 22, Ex. 29, March 11, 2004 email.)

Approximately one year later, in a "side letter" dated April 13, 2005, Defendant Helming provided to Ms. Berger a formal explanation of his belief that the Loan to Officer was not a bona fide loan and that Plaintiffs, including both RTR and the Bergers personally, faced potential tax liability.  (Dkt. No. 22, Ex. 34.)  Defendant Helming later requested that Ms. Berger sign a second side letter, dated

November 4, 2005, which outlined his opinion on the issue and which included Ms. Berger's acknowledgment that she had been so advised.  Additionally, Defendant Helming provided an estimate of the Bergers' tax exposure to both RTR and to the Bergers' tax attorney, Philip Vecchio.  (Dkt. No. 22, Ex. 64.)

Ms. Berger was dissatisfied with this advice and sought input from two tax attorneys on the issue.  First, she contacted Attorney David Stern, who "didn't say very much" about the problem.  (Dkt. No. 22, Ex. 3, R. Berger Dep. 140.)  Next, she spoke to Attorney Vecchio who expressed to Ms. Berger that he too was "concerned about the Loan to Officer" account.  (Id. at 134; 140-41.)

Eventually, the Bergers authorized Defendant Helming to amend their 2002 personal and corporate tax returns consistent with the advice set forth in the November side letter.  Ms. Berger explained that she acquiesced "against my better instinct and because I had no other options presented to me by Carl.  He told me that I was performing criminal acts [and that] I could go to jail."  (Dkt. No. 22, Ex. 3, R. Berger Dep. 145:10-15.)

As part of the amendment, Defendant Helming changed the supposed "loan" and re-characterized it as income to Ms. Berger.  On December 3, 2005, Ms. Berger, acting as president of RTR, signed RTR's amended 2002 corporate tax return, which included an amended W-2 form showing new compensation to Ms. Berger in the amount of $1,127,811.69. (Dkt. No. 22, Exs. 38, 40.)  The Bergers signed their amended 2002 personal tax return in January 2006.  (Dkt. No. 22, Ex. 41.)

The IRS accepted the amended 2002 returns and later issued an assessment dated May 31, 2006, with a federal tax lien entered against the Bergers on July 16, 2006, in the amount of $526,014.55.  The Bergers subsequently paid over $110,000 to taxing authorities and were listed as tax delinquents in the Connecticut Department of Revenue's listing of the "Top Delinquent Income Taxpayer Accounts." (Dkt. No. 32, Consolidated Statement Undisputed Mat. Facts ("CSUMF") ¶¶ 160, 308; Dkt. No. 22, Ex. 51.)

Defendants prepared and filed RTR's corporate tax returns for the years 2003, 2004, and 2005 as well as the Bergers' personal tax return for the same years.  As a

13

result of the 2002 amendment of RTR's corporate tax return, RTR went from having a net profit of $16,584 to having a net loss of $1,477,606.

E.   <u>RTR Re-Amends the 2002 Tax Returns and Sues Defendants</u>.

Defendants continued to work for RTR and the Bergers until 2008.  In 2008, after the parties ceased all business dealings, RTR hired Edward Szwyd as an in-house accountant to look into the "Loan to Officer" matter.  Mr. Szwyd informed Plaintiffs that, in his opinion, the designation of the "Loan to Officer" account as income was unnecessary and that they should re-amend their 2002 returns.

On October 1, 2008, Plaintiffs filed re-amended 2002 corporate and personal tax returns, which again classified the approximately one million dollars received by them from the company as a loan.  The re-amended return reduced Ms. Berger's compensation from $1,127,812 back to $104,000 for 2002 and increased the "Loan to Officer" account accordingly.

Plaintiffs' tax landscape still remains, despite the amendment and re-amendment, partly in shadow, since they have not so far filed any amended returns for the years 2003

through 2007. These returns apparently continue to reflect a one million dollar loss for the company. The re-amendment did ameliorate the position of the individual Plaintiffs, since, on May 20, 2009, the roughly $500,000 federal tax lien against the Bergers was released.

Plaintiffs claim that Defendants negligently advised them with respect to the "Loan to Officer" account and that they have suffered various damages as a result. The claimed damages include: (a) state and federal tax liability, including interest and penalties; (b) the cost of accounting remediation work totaling $31,200 plus an estimated $75,000 in future remediation expenses; (c) loss of goodwill; (d) loss of loans; (e) $365,943 in "unnecessary extrusion costs," which refers to the company's need to buy or lease extrusion materials (heat transfer coating applied to the company's heaters) from outside vendors at a substantial mark-up; (f) $3,139,618 in "lost profits"; (g) $906,933 in "lost incremental revenue damages"; and (h) $234,050 in "lost margin damages," i.e., monies paid to Defendants. (Dkt. No. 32, CSUMF ¶ 156.)

Plaintiffs commenced this action on October 9, 2009,

alleging six causes of action: (I) professional malpractice;
(II) breach of contract; (III) breach of the implied
covenant of good faith and fair dealing; (IV) breach of
fiduciary duty; (V) negligent misrepresentation; and (VI)
violation of Mass. Gen. Laws ch. 93A.

### III. DISCUSSION

#### A. Legal Standard.

Summary judgment is proper when "the pleadings, the
discovery and disclosure materials on file, and any
affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to a judgment
as a matter of law."  Fed. R. Civ. P. 56(c)(2); see Foley v.
Town of Randolph, 598 F.3d 1, 5 (1st Cir. 2010).  It is well
established that "when a properly supported motion for
summary judgment is made, the adverse party 'must set forth
specific facts showing that there is a genuine issue for
trial.'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250
(1986) (quoting Fed. R. Civ. P. 56(e)).  The non-movant
cannot rest upon mere allegations; rather, it must set forth
"specific, provable facts demonstrating that there is a
triable issue."  Brennan v. Hendrigan, 888 F.2d 189, 191

(1st Cir. 1989); <u>see also</u> D. Mass. R. 56.1 (requiring that a non-moving party's opposition to a motion for summary judgment include "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation").

B.   <u>Statute of Limitations</u>.

Plaintiffs commenced this action on October 8, 2009. Defendants assert that the allegedly tortious conduct occurred between December 2005 and January 2006, when they filed the amended tax returns, and that Plaintiffs were aware of the alleged harm by July 2006, when the IRS issued its federal tax liens against them, if not earlier. Accordingly, Defendants contend that Plaintiffs were well aware of the facts giving rise to this cause of action prior to October 8, 2006 and that the complaint was therefore filed well outside the three-year statutory period.  For the reasons set forth below, this court agrees.

1.   <u>The Applicable Statutory Period</u>.

As a threshold matter, Plaintiffs argue that the court should apply either the six-year statute of limitations

governing contract claims or the four-year statute governing violations of Mass. Gen. Laws ch. 93A.  Defendants maintain that the three-year statute for torts applies.

In Massachusetts, the applicable time period for a claim of malpractice by a certified public accountant is three years.  See Mass. Gen. Laws ch. 260, § 4 ("Actions of contract or tort for malpractice, error or mistake against attorneys, certified public accountants and public accountants . . . shall be commenced only within three years next after the cause of action accrues."); Kennedy v. Goffstein, 815 N.E.2d 646, 648 (Mass. App. Ct. 2004) (applying statute to accounting malpractice claim).  Where a complaint presents multiple causes of action, courts look to the "essential nature" of the plaintiff's claims to determine the applicable statutory period.  Desmond v. Moftie, 375 F.2d 742, 743 (1st Cir. 1967); see also Hendrickson v. Sears, 310 N.E.2d 131, 133 (Mass. 1974) ("[W]e have looked to the 'gist of the action' or the essential nature of the plaintiff's claim.").

Here, it is undeniable that the essential nature of Plaintiffs' claims is professional malpractice by a

certified public accountant.  The law in Massachusetts is clear that a plaintiff cannot double the length of the limitations period in this circumstance by simply re-casting a malpractice claim as an action for breach of a contract.[3] See <u>Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc.</u>, 489 N.E.2d 172, 175 (Mass. 1986) ("A plaintiff may not, of course, escape the consequences of a statute of repose or statute of limitations on tort actions merely by labeling the claim as contractual.").  Permitting this kind of stratagem would render the three-year statutory deadline for filing malpractice actions against accountants meaningless. Consequently, the three-year statute of limitations applies.

>    2.    <u>Application of the Three-Year Statute to Plaintiffs' Claims</u>.

Massachusetts employs the "discovery rule" to determine the accrual date for accountant malpractice claims. <u>Kennedy</u>, 815 N.E.2d at 648.  This rule provides that the statute of limitations begins to run when a plaintiff "knows

_____

[3] Defendants concede that Plaintiffs' 93A claim (Count VI) is subject to the four-year statute.  This claim, however, fails as a matter of law for independent reasons discussed below.

or reasonably should know that he or she has sustained appreciable harm as a result of the [defendant's] conduct." Lyons v. Nutt, 763 N.E.2d 1065, 1068-69 (Mass. 2002) (citation omitted).

The discovery rule imposes a "duty to investigate" on a plaintiff who has cause for concern. Epstein v. CR Bard, Inc., 460 F.3d 183, 188 (1st Cir. 2006).

> Accrual is triggered by the discovery of sufficient facts about the injury and its cause to prompt a reasonable person to inquire and seek advice preliminary to deciding if there is a basis for filing [a claim].

Skwira v. United States, 344 F.3d 64, 78 (1st Cir. 2003). "Critically, knowledge of 'every fact necessary to prevail on the claim' is not required to put the plaintiff on inquiry notice and trigger the accrual period." Epstein, 460 F.3d at 188 (quoting Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 560 N.E.2d 122, 124 (Mass. App. Ct. 1990)). Plaintiffs have the burden of demonstrating that their claim is not barred by the applicable statute of limitations. Albrecht v. Clifford, 767 N.E.2d 42, 49 (Mass. 2002).

Here, Plaintiffs were on inquiry notice well before

October 8, 2006 -- three years prior to the filing of the complaint.  To begin with, Defendant Helming discussed the Loan to Officer issue with Sera Daemi and Ms. Berger many times throughout 2005 in the form of in-person communications, emails, and letters.  (See Dkt. No. 22, Ex. 6, Daemi Dep. 151, 160; Ex. 34, April 2005 Side Letter; Ex. 56, Helming email with handwritten note dated 5/12/2005.)  On each of these occasions, Ms. Berger resisted Defendant Helming's advice and expressed serious reservations to him.  At her deposition, Ms. Berger explained that she didn't agree "philosophically" with the advice and perceived it to be "poorly thought out."  (Dkt. No. 22, Ex. 3, R. Berger Dep. II, 112:7, 125:2-3.)  She explained, "in my gut, I'm not a tax professional, but [I] thought there must have been another way."  (Id. 138:23-139:1.)  In short, she "felt strongly that it was not the right way for [her] company."  (Id. 140:17-18.)

These were not vague and fleeting feelings of dissatisfaction.  In fact, Ms. Berger's skepticism was strong enough to prompt her to consult with two tax attorneys before making a decision.  She first contacted

Attorney David Stern, who, according to her, did not offer any notable insights into the issue.  (<u>Id.</u> 140:9-12.)  Next, she spoke to Attorney Vecchio, who echoed Defendants' concerns about the Loan to Officer.  (<u>Id.</u> 134; 140-41.)  After months of discussing the issue with various tax professionals, Ms. Berger finally acquiesced.  She signed the amended corporate and personal returns in December 2005 and January 2006, respectively.

Thus, by December 2005, Ms. Berger not only had "cause for concern," <u>Epstein v. CR Bard, Inc.</u>, 460 F.3d 183, 188 (1st Cir. 2006), but she had also repeatedly and openly expressed that concern to various individuals.  In malpractice cases alleging the negligent provision of professional advice, expressions of misgiving are compelling proof that the plaintiff was on notice.  <u>See</u> <u>Lyons v. Nutt</u>, 763 N.E.2d 1065, 1069 (Mass. 2002) (holding that statute of limitations on legal malpractice claim began to run on date when client concluded that his attorneys "didn't know what they were doing").

Perhaps the strongest support for the assertion that Plaintiffs' duty to investigate arose in late 2005 is the

fact that Ms. Berger actually was investigating the matter at that time. This is not a case in which the plaintiff fails to investigate potential wrongdoing, and the defendant argues that a reasonably prudent person would have investigated the matter. Cf. Warren Freedenfeld Assoc., Inc. v. McTigue, 531 F.3d 38, 44-46 (1st Cir. 2008) (labeling the question of whether a reasonable person would have investigated a possible claim of copyright infringement a "fact-sensitive enterprise" and reversing district court's holding that claim was time-barred).

In stark contrast, this case presents the rather unusual situation in which the plaintiff was actively investigating the disputed issue several years before filing suit and even consulted with two different attorneys at that time. The actual investigation of the wrongful conduct at issue is powerful, probably conclusive, evidence that the plaintiff was on inquiry notice. See Epstein, 460 F.3d at 188-89 (holding that district court did not err in dismissing action for misappropriation of trade secrets as time-barred where plaintiff's representative had sent defendant a letter stating that he was "confus[ed]" about

why defendant was continuing to use plaintiff's intellectual property without a license).

Even the most charitable reading of the facts (from Plaintiffs' perspective) would not change this outcome. Assuming _arguendo_ that Plaintiffs were not on inquiry notice in late 2005, Plaintiffs were without question placed on notice on May 31, 2006, when the IRS issued a revised assessment of delinquent _personal_ income taxes in the amount of $526,000 and subsequently filed a federal tax lien in July. Yet, even pushing back the accrual date until July 2006 would not save Plaintiffs' claims, as they did not file the complaint until October 2009.[4]

---

[4] Notably, "most courts, and particularly those that apply the discovery rule in determining when a cause of action accrues, have adopted the date of formal tax assessment as the accrual date in cases similar to this." Kennedy v. Goffstein, 815 N.E.2d 646, 649 (Mass. App. Ct. 2004) (citation omitted). As the appeals court noted,
> [t]he deficiency assessment serves as a finalization of the audit process and the commencement of actual injury because it is the trigger that allows the IRS to collect amounts due and the point at which the accountant's alleged negligence has caused harm to the taxpayer.

Id. (citation omitted). Nonetheless, the court declined to adopt this rule. Id. at 650 (eschewing a bright-line rule establishing the triggering event in accountant malpractice cases because "there are just too many different possible fact scenarios in the complicated, cumbersome, maze-like world of taxes and accountants").

Plaintiffs are left to argue that the statute did not begin to run until sometime in 2008, when they hired their current accountant, Mr. Szwyd, to look into the Loan to Officer issue and when Mr. Szwyd offered his opinion that the amendments were ill-advised. Plaintiffs emphasize that Ms. Berger is not a tax professional and could not have known that Defendants' actions were improper.

It is true, as Plaintiffs observe, that

> [a]n accountant, like an attorney or a doctor, "is an expert, and much of his work is done out of the client's view. The client is not an expert; he cannot be expected to recognize professional negligence if he sees it, and he should not be expected to watch over the professional or to retain a second professional to do so."

Kennedy, 815 N.E.2d at 648 n.9 (quoting Hendrickson v. Sears, 310 N.E.2d 131, 135 (Mass. 1974)). Yet, while such language might be helpful in a case in which the plaintiff pleaded ignorance as an excuse for failing to question or investigate dubious advice by her accountant, it holds no weight here, where Plaintiffs did question and did investigate the conduct at issue.

Moreover, the fact that Ms. Berger did not firmly conclude that Defendants had acted negligently until she

25

spoke to Mr. Szwyd in 2008 is irrelevant to this analysis. The law is clear that actual knowledge of negligence is not required to start the limitations period running.  See Skwira v. United States, 344 F.3d 64, 76 (1st Cir. 2003) ("[The Supreme Court] answered one important question that had divided the courts: whether the accrual of a claim depended on a victim's actual knowledge of negligence.  The court answered that question in the negative.") (citing United States v. Kubrick, 444 U.S. 111, 121 n.8 (1979)).

Here, Plaintiffs had both actual and constructive knowledge of the harm allegedly suffered (a whopping $500,000 personal tax liability) and the individual who caused this alleged harm (Defendant Helming).  Although Plaintiffs may not have known whether Defendant Helming's advice constituted professional malpractice, such knowledge is not required to trigger the statute.  See Catrone v. Theoroughbred Racing Assoc. N.A., Inc., 929 F.2d 881, 885 (1st Cir. 1991) ("Under the Massachusetts discovery rule, the running of the statute of limitations is delayed while the facts, as distinguished from the legal theory for the cause of action, remain inherently unknowable to the injured

party.") (citations and quotation marks omitted).

Likewise, Plaintiffs' argument finds no shelter in the fact that the advice (or lack of advice) they received from Attorneys Stern and Vecchio in 2005 caused Ms. Berger to suppress her misgivings and delay this cause of action.

> [T]he putative malpractice plaintiff must determine within the period of limitations whether to sue or not, which is precisely the judgment that other tort claimants must make. If [s]he fails to bring suit because [s]he is incompetently or mistakenly told that [s]he does not have a case, we discern no sound reason for visiting the consequences of such error on the defendant . . . .

Kubrick, 444 U.S. at 124; see also Gonzalez v. United States, 284 F.3d 281, 290 n.10 (1st Cir. 2002) ("[O]nce the plaintiff was on notice of the injury and its potential cause, the limitations period began to run regardless of whether she had made inquiries, and continued to run even if she had been incorrectly advised.").

Plaintiffs advance one final argument: that the "continuing representation" doctrine tolled the running of the statute. The continuing representation doctrine "tolls the statute of limitations in legal malpractice actions where the attorney in question continues to represent the plaintiff's interests in the matter in question." Murphy v.

Smith, 579 N.E.2d 165, 167 (Mass. 1991) (emphasis added).
Here, although Defendants continued to perform services for
Plaintiffs in other capacities after amending the 2002 tax
returns, e.g., as turnaround specialists, they no longer
advised Plaintiffs with respect to the issue at the heart of
this case: whether to classify the Loan to Officer as wages
and amend the 2002 tax returns to reflect this
classification.  Thus, even if the court were to apply the
continuing representation doctrine in this context -- which,
Plaintiffs concede, would be the first such application in
Massachusetts -- it would not alter the outcome in this
case.  Furthermore, the doctrine is inapplicable in cases
where, as here, "the client actually knows that [s]he
suffered appreciable harm as a result of [the defendant's]
conduct" because "there is no innocent reliance which the
continued representation doctrine seeks to protect."  Lyons,
763 N.E.2d at 1070 (citation and quotation marks omitted).

    In sum, the evidence overwhelmingly establishes that
Plaintiffs knew of the alleged wrongdoing well before
October 8, 2006.  This indisputable fact pushes Plaintiffs'
claims beyond the three-year limitations deadline.  Since

the record permits no reasonable alternative conclusion, summary judgment is required.  See <u>Vinci v. Byers</u>, 837 N.E.2d 1140, 1145 (Mass. App. Ct. 2005) ("Although the question when the cause of action accrued typically presents a question of fact, when the facts regarding discovery of harm are undisputed, the question may be decided as a matter of law.").

The clear violation of the three-year limitations period is more than sufficient to justify allowance of Defendants' motion for summary judgment.  To insure completeness in the event of any further proceedings, however, it is appropriate to address in addition several glaring substantive defects in Plaintiffs' claims.

C.  <u>Count I: Professional Malpractice</u>.

For professional malpractice claims, the court's inquiry centers on whether the defendant "failed to exercise reasonable care and skill in handling the client's matter, a classical tort negligence standard."  <u>Clark v. Rowe</u>, 701 N.E.2d 624, 626 (Mass. 1998).  "Accountants are subject generally to the same rules of liability for negligence in the preparation of tax returns for others as members of

other skilled professions are in the practice of their professions." 81 A.L.R. 3d 1119, § 3 (West 2011); <u>see also</u> <u>Miller v. Volk</u>, 825 N.E.2d 579, 582 (Mass. App. Ct. 2005) (applying traditional negligence standard in malpractice case against accountant for provision of negligent tax advice).

One obvious element in any traditional negligence claim is damages. To determine damages in accounting malpractice actions, courts look not simply to the tax deficiency assessed by the government, but rather to the difference between the tax liability produced by the negligently filed returns and that produced by the properly filed returns. <u>See</u> <u>Miller v. Volk</u>, 825 N.E.2d 579, 582 (Mass. App. Ct. 2005) ("The general rule is that the amount of a tax deficiency is not necessarily the measure of damages imputable to a negligent tax preparer."); <u>Thomas v. Cleary</u>, 768 P.2d 1090, 1092 n.5 (Alas. 1989) ("[T]he appropriate measure of damages is the difference between what the [plaintiffs] would have owed in any event if the tax returns were properly prepared, and what they owe now because of their accountants' negligence, plus incidental damages.").

Here, Plaintiffs cannot prove damages, because (1) the record is insufficient to establish that Defendants' amendment of the 2002 tax returns will cause Plaintiffs to incur greater tax liability once they have filed all tax returns as required by law; (2) Defendants' advice to file the amended return for 2002 was prudent and ethical as a matter of law; (3) the record lacks evidence of any viable alternatives to Defendants' chosen approach; and (4) Plaintiffs cannot establish a causal link between their claims for lost profits and Defendants' actions.

### 1.    Inadequate Proof of Increased Tax Liability.

To establish damages, Plaintiffs rely primarily on the testimony of expert witness Peri Aptaker, a tax attorney and certified public accountant.  According to Ms. Aptaker, Defendants were not obligated to, and therefore should not have, amended the 2002 tax returns.  Rather than retroactively convert the "loans" to income, Defendants should have dealt with the issue "on a prospective basis." (Dkt. No. 22, Ex. 50, Aptaker Rep. at 9.)  She concludes:

> If Helming was not satisfied that the loan could be documented as legitimate and a payment plan set up and adhered to, then he could have recommended writing the loans off as distributions in 2005 and

later years.

(Id.)  Significantly, Ms. Aptaker never states that she
approves of Plaintiffs' characterization of the more than
$1,000,000 that the Bergers took out of the company as
"loans."

The defect in Ms. Aptaker's evidence is that, while it
suggests a different approach to Plaintiffs' tax problems,
it provides no basis for concluding that the approach taken
by Defendants (filing amended returns) caused Plaintiffs to
incur additional tax liability above and beyond what they
otherwise would have faced.  It is true that the amendments
suggested by Defendants resulted in the IRS subsequently
filing a tax lien against the Bergers in the amount of more
than $500,000, almost all of which was abated when Mr. Szwyd
re-amended the returns in 2008.[5]  Based on this, Ms. Aptaker
states in conclusory fashion that, unlike Defendants' chosen
course of action, dealing with the bogus "loan"

---

[5] This includes $653,581 in federal income taxes plus
penalties and interest, $44,467 in federal medicare taxes,
$19,925 in Massachusetts income taxes, and "somewhere
between $30,000 and $40,000" of the $62,635 owed in
Connecticut income taxes.  Plaintiffs concede that they do
not know how much, if any, of the difference they ultimately
will owe to the state of Connecticut.  (Dkt. No. 32, CSUMF ¶
166.)

prospectively would have resulted in "no adverse tax
consequences to the company or the Bergers." (Dkt. No. 22,
Ex. 50, Aptaker Rep. at 10.) But a closer inspection of the
record and the law reveals that this is plainly not the
case.

By amending the 2002 tax returns and classifying the
Loan to Officer as income to Ms. Berger, Defendants
generated significant tax liability for the Bergers
personally, but they also established an equivalent <u>loss</u> on
the company's books that could be used in future years to
offset gains and thereby decrease RTR's tax exposure.[6]
Because RTR is a Subchapter S corporation, all profits and
losses flowed through to its sole shareholder -- Ms. Berger.
Furthermore, RTR would receive a deduction for wages, which
would also flow through to Ms. Berger. Consequently,
Plaintiffs' increased tax exposure resulting from the wage
classification would have been counterbalanced by tax
benefits that flowed through RTR to the Bergers personally.

When Mr. Szwyd re-amended the 2002 tax returns to once

---

[6] Plaintiffs effectively concede this point. (<u>See</u> Dkt.
No. 26, Pls.' Mem. Opp'n at 30 ("[T]he tax loss, to which
Defendants refer, may [have] been carried forward in
subsequent years to reduce future taxable income . . . .")

more classify the approximately $1 million withdrawn by Ms. Berger as a "loan," he caused the IRS to abate the tax liens filed against the Bergers, but he also eliminated a substantial loss (and a deductible expense) from the company's books -- or at least he should have.

Critically, strangely, and perhaps significantly, Plaintiffs have never, through Mr. Szwyd or any other tax professional, amended the subsequent tax returns -- for the years 2003, 2004, 2005, 2006, and 2007 -- to reflect the re-classification of the Loan to Officer in the 2002 return. As a result, amending only the 2002 tax returns eliminated the estimated $500,000 tax liability caused by Defendants' actions and allowed Plaintiffs to reap the benefits of the million-dollar loss carried forward by RTR in the years that followed. Defying logic and IRS regulations, Plaintiffs are at the present time, in essence, having their cake and eating it too -- and trying to get an extra dollop of whipped cream by reaping damages from Defendants.

Defendants' expert, David Truesdell, correctly explains:

> [I]n 2005, after H&C amended the 2002 returns, the Bergers took the benefit of the wage expense on

> RTR's books.  This wage expense would later be
> reversed by Mr. Szwyd.  This reversal created a
> substantial income item to be reported by the
> Bergers.  Assuming RTR and the Bergers ultimately
> do amend their 2003 through 2007 tax returns, this
> will result in paying additional taxes.

(Dkt. No. 22, Ex. 65, Truesdell Rep. at 22.)

As a separate but related matter, Mr. Truesdell notes
that amending the 2003 through 2007 tax returns will result
in a taxable event to the Bergers personally, in addition to
the increased taxes resulting from the company's inability
to claim a wage expense.  (Id. at 24-25.)  It is undisputed
that Ms. Berger withdrew approximately one million dollars
from the company and never paid it back.  Whether she pays
down the "loan" over time by redirecting company profits, or
takes care of it in the same taxable year by classifying it
as income, she will have to pay taxes on those monies.

However, at the risk of repetition, it must be
emphasized that Plaintiffs, to this day, have not amended
their 2003 through 2007 tax returns.  (See Dkt. No. 39, Ex.
45, Szwyd Dep. 153:15-20 ("There's still amended returns
that need to be done.  In 2002 when we reclassified the loan
back to officer's loan, I need to go back and amend 2003,
'4, '5, '6,'7 returns all the way up through 2008.").)

Until these returns are prepared, filed, and accepted, Plaintiffs cannot know their tax liability for those years, and therefore they will not know whether that liability will be more, less, or (most likely) the same as what they faced under Defendants' tax plan.  Mr. Szwyd acknowledged as much in his deposition:

> Q.   And do you know exactly how much money will be owed in taxes or how much rebate will be received once you file amended 2003, '4, '5, '6, and '7 tax turns for RTR and the Bergers?
>
> A.   No, I do not.
>
> Q.   You're not going to know that until it's done and the IRS accepts it and makes its determinations?
>
> A.   Correct.

(Id. 181:6-14.)

To attempt to cure this fundamental defect, Plaintiffs filed a Motion for Leave to File Sur Reply (Dkt. No. 33) on May 20, 2011 -- less than two weeks before oral argument -- and attached proposed (not filed) amended tax returns for the years 2003 through 2009.  These proposed tax returns were prepared by Mr. Szwyd and purport to show an alternative treatment of the Loan to Officer whereby the loan is carried forward and paid down over time, rather than

treated as wages in a single tax year.  Plaintiffs filed an accompanying affidavit by their expert, Ms. Aptaker, who opined that this alternative treatment is reasonable and would result in a net decrease of $202,985 in tax liability. (See Dkt. No. 33, Aptaker Aff. ¶ 6 ("I have reviewed Mr. Szwyd's analysis . . . and I have determined that this alternative treatment . . . is reasonable and appropriate.").)

Defendants argue that the court should reject these documents for a number of reasons: (1) Plaintiffs produced three sets of answers to interrogatories discussing their claims for damages, yet none contain any discussion of increased tax liability; (2) Plaintiffs' expert disclosure (completed January 25, 2011) did not include Mr. Szwyd as an expert witness, yet he is the one who produced the recently filed documents; (3) despite being questioned about the 2003 through 2007 tax returns at his deposition, Mr. Szwyd never mentioned any proposed amended returns; (4) Ms. Aptaker's accompanying affidavit merely provides an unsupported conclusion that the proposed filing is "reasonable and appropriate" without any elaboration; (5) the returns have

not even been filed yet, so they are not evidence on which a trier of fact could base a damages award; and (6) the accompanying affidavits do not explain how Mr. Szwyd arrived at the $200,000 figure and, instead, rely on an almost unreadable chart labeled Exhibit B, which purports to show a comparison between the actual tax returns and the proposed amended returns.  (Dkt. No. 33, Szwyd Aff., Ex. B.)

The court agrees, for all of the reasons just stated, that Plaintiffs' proposed sur-reply is far too little, way too late.  Plaintiffs' failure to produce this information until a few days before the motion hearing is neither substantially justified nor harmless.  Accordingly, the court will deny Plaintiffs' Motion to File Sur Reply (Dkt. No. 33) and strike the accompanying documents.  See Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by [the Federal Rules], the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless.").

Plaintiffs have offered no plausible explanation for

failing, after so many years, to amend the 2003 through 2007
returns, or at least to produce during discovery well
explained estimates of what those returns will show.  It is
true, as a general matter, that "an element of uncertainty"
as to the amount of damages is not an automatic bar to
recovery.  (Dkt. No. 26, Pls.' Mem. Opp'n at 31 (quoting
Nat'l Merch. Corp. v. Leyden, 348 N.E.2d 771, 774 (Mass.
1976)).  But the problem here is not a lack of absolute
certainty; it is the absence from the record (based largely
on Plaintiffs' own inconsistent conduct) of any cognizable
evidence of damages at all.

       This gaping hole in the record cannot be filled or
excused by reference to a minor, long-delayed dispute with
the state of Connecticut over tax liability, which
(Plaintiffs say) has somehow prevented them from filing
amended returns.  A relatively minor peripheral dispute of
this sort cannot justify a litigant's failure to satisfy
obligations under Rule 56.  Simply put, in this summary
judgment context, Plaintiffs' inability to identify facts of
record that would justify a jury in concluding that
Defendants' advice caused Plaintiffs to suffer greater tax

liability than they otherwise would have incurred is fatal to their malpractice claim.

2.  <u>Defendants' Advice Legally and Ethically Required</u>.

Beyond the absence of adequate record evidence demonstrating damages is the fact that, as a matter of prudence, ethics, and law, Defendants' advice to Plaintiffs, and Plaintiffs' decision to accept that advice, was perfectly correct.

Significantly, no expert testimony disagrees with this proposition.  As noted above, one of Plaintiffs' experts, Ms. Aptaker, suggests that Defendants could have left the Loan to Officer on the company's books and dealt with it prospectively by paying it down over time.  She carefully does <u>not</u> opine that the characterization of the more than $1,000,000 as a "loan" was legally justified -- only that it could have been fudged later on.  Indeed, Ms. Aptaker implies, disturbingly, that when an accountant notices an error on a prior tax return, he or she is under no obligation to file an amended return.  She explains:

> The original 2002 corporate tax return was filed on or about September 15, 2003.  The statute of limitations on that tax return was due to expire on October 15, 2006.  RTR is an S corporation and all

> items of income and loss flow-through to its
> shareholder, Rosalie Berger.  Mr. and Ms. Berger's
> 2002 individual tax return was filed on or about
> October 15, 2003, and the statute of limitations
> was due to expire on October 15, 2006.  Helming was
> advising the Berger[s] to amend their 2002
> corporate tax returns in the fall of 2005.  The
> statute of limitations had less than one year to
> run.  The amended RTR return was filed on November
> 23, 2005, and the amended personal Berger return
> was filed on January 10, 2006.

(Dkt. No. 22, Ex. 50, Aptaker Rep. at 9.)

Boiled down to its essence, Ms. Aptaker appears to be

suggesting, not that the bogus "loan" classification was

legitimate and legal, but rather that the statute of

limitations might have run its course before the IRS could

audit Plaintiffs' tax returns and catch the falsehood, if

Defendants had just kept quiet.  Put differently, her

opinion appears to be that Defendants should not have

amended the 2002 return -- assuming it was false, which she

studiously does not dispute -- because they probably could

have squeezed it through the limitations period and

snookered the IRS and the American taxpayers.

Apart from its ethical aroma, this explanation is

flawed for several reasons.  To begin with, as noted, Ms.

Aptaker does not challenge Defendants' assessment of the

Loan to Officer -- that is, she does not dispute their conclusion that the "loan" was not a bona fide loan. In fact, all the parties that reviewed RTR's financial records agreed (or at least none disagreed) with Defendants' assessment. In addition to Defendant Helming, Plaintiffs' former accounting firm (P+C),[7] the SBA, and Plaintiffs' tax attorney, Attorney Vecchio, all concluded that the "Loan to Officer" characterization was not defensible. Even Mr. Szwyd refused to support the loan classification:

> I don't know that I ever said it was appropriate to carry it on the books. The loan was there. My idea was that -- my whole argument and my position to Rosalie is that we could handle this loan going forward.

(Dkt. No. 45, Szwyd Dep. 136:3-7.) Defendants cite numerous authorities which have held that, under facts similar to those presented here, the purported "loan" was not a bona fide loan and could not be reported as such by the company.[8]

---

[7] In P+C's June financing profile, the company valued these "assets" at 0, thus underscoring their view that the "loan" was uncollectible and was essentially worthless. (Dkt. No. 22, Ex. 21.)

[8] This determination turns on the shareholder's intent to repay and lists the following factors, all cutting against Plaintiffs: the degree of corporate control enjoyed by the taxpayer; the corporate earnings and dividend history; the use of customary loan documentation; the

See, e.g., <u>Crowley v. C.I.R.</u>, 962 F.2d 1077, 1084 (1st Cir.

1992); <u>Busch v. C.I.R.</u>, 728 F.2d 945, 951 (7th Cir. 1984);

<u>Alterman Foods, Inc. v. United States</u>, 611 F.2d 866, 873

(Ct. Cl. 1979); <u>Tachler's Estate v. United States</u>, 440 F.2d

72, 77 (3d Cir. 1971); <u>Haber v. Commissioner</u>, 52 T.C. 255,

266 (Tax Ct. 1969).  Significantly, Plaintiffs have not

scrupled to provide <u>any</u> contrary legal authority.

Thus, there is no genuine dispute as to the

illegitimacy of the "loan" classification; it was not a

permissible tax position.[9]  It follows, then, that

Defendants -- acting as both turnaround specialists and tax

---

creation of legal obligations attendant to customary lending
transactions, such as payment of interest, repayment
schedules and maturity dates; the manner of treatment
accorded the disbursements, as reflected in corporate
records and financial statements; the existence of
restrictions on the amounts of the disbursements; the
magnitude of the disbursements; the ability of the
shareholder to repay; whether the corporation undertook to
enforce repayment; the repayment history; and the taxpayer's
disposition of the corporate funds disbursed.  <u>See</u> <u>Crowley</u>,
962 F.2d at 1084.

[9] Notwithstanding Plaintiffs' arguments to the
contrary, the government's "acceptance" of Mr. Szwyd's re-
amended 2002 tax returns has no significance.  Plaintiffs
concede that the IRS never approved of the loan
classification during a formal audit, and the mere fact that
the IRS did not immediately reject Mr. Szwyd's 2008 filing
is irrelevant.

consultants -- had both a legal and ethical obligation to identify and correct this falsity. Ms. Aptaker's assertion that Defendants should not have advised their clients to amend an obviously unsupported, and unsupportable, tax return because they could have fudged it or (as she implies) put one over on the IRS is disturbing, to say the least. More to the point in this lawsuit, it is hardly an argument to support a claim that Defendants failed in their professional responsibilities.

As Defendants note, IRS Circular 230 requires that a tax preparer "who knows that the client has not complied with the revenue laws of the United States or has made an error in or omission from any return . . . must advise the client promptly of the fact of such noncompliance, error or omission . . . [and] of the consequences . . . of such noncompliance, error, or omission." IRS Circular 230 § 10.21 (emphasis added). This provision is broadly worded such that Defendants would have been exposing both their clients and themselves to liability if they had ignored the significant mis-characterization in the 2002 return. Id.; see also American Institute of Certified Public Accountants

(AICPA) Statements on Standards for Tax Services, No. 1 at 7(a) (effective Jan. 1, 2010) (prohibiting accountants from "exploit[ing] the audit selection process of a taxing authority").

Moreover, Ms. Aptaker's argument fails to consider an important fact: when Plaintiffs retained Defendants to provide tax preparation services in 2005, RTR had not filed returns for the previous two years.  Thus, Defendants were required to prepare and file returns for 2003 and 2004 and, accordingly, were forced to confront the "Loan to Officer" issue at that time.  As Defendants observe, the need to file the 2003 and 2004 returns "meant that H&C could not . . . clear the 'loans' from RTR's books starting in 2005, as that would require it to file false tax returns for 2003 and 2004." (Dkt. No. 31, Defs.' Reply at 3.)  To follow the course Plaintiffs suggest, then, Defendants would not only have had to turn a blind eye to the clear falsehood in the 2002 return -- bad enough in itself -- but affirmatively join in the misrepresentation to prepare the 2003 and 2004 returns.

In sum, Ms. Aptaker's critique of Defendants' approach

to the 2002 returns is, at best, dubious both legally and ethically. More importantly for the narrow purposes of this motion, it provides no sufficient evidence that Defendants' advice to file an amended 2002 return, which Plaintiff knowingly took, was anything other than entirely consistent with good professional accounting practice. The returns contained a false representation, which permitted Plaintiffs to enjoy more than $1,000,000 in income tax-free, and Defendants were obligated to correct it. This, as a matter of law, was not a tort; it was honest accounting.

     3.   <u>No Viable Alternatives</u>.

As the foregoing discussion makes clear, Defendants had no choice but to amend the 2002 tax returns, thus undercutting Plaintiffs' primary argument. However, Plaintiffs make two additional claims: (1) Defendants could have re-characterized the "Loan to Officer" monies as "distributions" rather than wages; and (2) Defendants "could have legitimatized the loans by creating a promissory note with terms." (Dkt. No. 33, Aptaker Aff. ¶ 10.) The record and the law support neither of these arguments.

As to the first contention, Ms. Aptaker asserts that if

Defendants had re-characterized the Loan to Officer monies

as distributions, then the income would have been taxed at

the lower capital gains rate rather than at the higher

ordinary income rate.  On the other hand, Defendants'

expert, Mr. Truesdell, explains why a wages classification

was preferable:

> It was a tax neutral position; RTR would receive a
> deduction for wages and Ms. Berger would record
> salary income.  Because of RTR's status as an S
> Corporation, the effect would be that the deduction
> for wages reduced RTR's income, which flows through
> and is reported on the Berger[s'] personal returns.

(Dkt. No. 22, Ex. 65, Truesdell Rep. at 21.)  Mr. Truesdell

further explains that, in contrast, characterizing the loans

as distributions "would have the very negative consequence

of not being deductible for RTR while still taxable to Ms.

Berger."  (Id.)

Plaintiffs have failed to offer any response to Mr.

Truesdell's obvious point.  Indeed, Plaintiffs have not even

offered a comparison of how the re-characterization of the

bogus "loan" as a distribution would have improved

Plaintiffs' overall tax position.  Ms. Aptaker does not

mention what the applicable tax rates would be on the

distributions, let alone provide a detailed analysis of the

two approaches.[10]  At the summary judgment stage this species of deficiency is fatal.

As for Ms. Aptaker's final point concerning "legitimatizing" the loan, she also fails to provide <u>any</u> explanation of how this could be accomplished, and, in fact, this argument appears for the first time in her affidavit attached to Plaintiffs' Motion to File Sur Reply, which will be stricken for the reasons already stated.  More importantly, the argument ignores the now well-established fact that these were not bona fide loans and that Ms. Berger had no ability to make payments towards them at that time.

These last-ditch assertions only underscore the need for clarity on the issue of damages -- something that is painfully absent here.  It is conceivable, perhaps, that classifying the loans as distributions may have altered Plaintiffs' tax picture favorably.  It is equally possible,

_____

[10] To the extent that Plaintiffs contemplated asking Ms. Aptaker to flesh out this argument at trial, such testimony would have been a clear violation of Rule 26's expert disclosure requirement.  <u>See</u> Fed. R. Civ. P.  26(a)(2)(B) (requiring pre-trial expert disclosure to contain, <u>inter alia</u>, a complete statement of all opinions the witness will express and the basis and reasons for them, as well as the facts or data considered by the witness in forming each opinion).

perhaps more likely, that, as Mr. Truesdell claims, the tax benefit generated by the lower capital gains rate would have been outweighed by the countervailing benefits created by a wage deduction. Plaintiffs had an obligation to explain the comparative weight of these positions and provide evidentiary support for their conclusion, but they failed to do so.

    4.  <u>Lost Profits</u>.

Given the discussion above, little discussion is needed to dispose of the claims for lost profits. First, the record does not provide anything approaching adequate evidence that Defendants' professional conduct fell below the appropriate standard. Indeed, the record, if anything, demonstrates the contrary. Second, the lost profits estimates are constructed largely out of thin air, particularly the estimate of over four million dollars in lost revenues based on speculation regarding work the company supposedly would have received but for Defendants' allegedly negligent advice.

Plaintiffs rely on the expert testimony of Bradford Taylor, who explains that "[a] company suffers lost profits

when one of the following occurs due to the acts of a
defendant: (a) revenues are lower than they would have been,
(b) costs are higher than they would have been, or (c) some
combination of the two." (Dkt. No. 22, Ex. 49, Taylor Rep.
at 1.) His calculation of $4.2 million in lost profits is
based on estimates of the value of:

> (A) Lost revenues resulting from engagements RTR
> was not able to win as a result of either not being
> able to attain the necessary bonding or having tax
> liens placed upon it . . . .

> (B) Lost incremental revenue resulting from engagements
> during which RTR was not able to become the Prime
> contractor and instead, RTR became a Sub-Contractor . .
> . .

> (C) Lost margin associated with incurring Helming
> expenses.

(Id. at 4-5.)

For each of these three categories of damages, Mr.
Taylor provides a conclusory statement connecting them to
actions taken by Defendants. With regard to lost revenues,
he states, "But for the actions of Helming, RTR would have
been able to obtain the required bonding to win these
contracts and/or the Company would not have had the tax
liens placed upon it." (Id. at 5.) With regard to lost
incremental revenue, he states, "But for the actions of

Helming, RTR would have been the Prime Contractor for these contracts." (Id.) With regard to lost margin costs, he asserts, "the Company has incurred various expenses in attempting to mitigate the damage caused by Helming." (Id.)

Mr. Taylor provides no explanation whatsoever of the evidence on which these conclusory statements are based. He does not discuss the process by which Plaintiffs allegedly applied for, and failed to receive, the relevant contracts. He does not describe the other companies that made bids or demonstrate how Plaintiffs would necessarily have won the contracts at issue but for the actions of Defendants. In fact, he does not cite a shred of concrete evidence tending to establish a causal link between Defendants' actions and Plaintiffs' alleged losses.[11]

Plaintiffs' remaining claims for consequential damages are similarly unsupported. Given the false characterization

---

[11] Plaintiffs also point out that Ms. Berger herself testified that RTR bid on four projects following the amendment of the 2002 tax returns and that the bids were rejected for failure to meet bonding requirements. (Dkt. No. 39, Ex. 3, R. Berger Dep. Vol. II 185-88.) Ms. Berger, in fact, stated without explanation that RTR's inability to meet bonding requirements "was absolutely one of the reasons why we could not take that contract" and was "the most major" reason. (Id. at 190:11-16.) (Emphasis supplied).

of the $1,000,000 as a loan, Plaintiffs were necessarily

going to face some significant tax liability in 2006 or

thereafter.  No accounting stratagem, other than an outright

scam, was going to allow Plaintiffs to retain these funds

tax-free.  More importantly for present purposes, even if

the tax burden had differed slightly, Plaintiffs would still

have suffered remediation expenses, loss of goodwill,

extrusion costs, and lost profits -- or at least they have

offered no basis from which a jury could reach any other

conclusion.  Thus, for these reasons and for the other

reasons detailed above, Defendants are entitled to summary

judgment on all claims for lost profits.

D.    Counts II and III: Breach of Contract and Breach of the
      Implied Covenant of Good Faith and Fair Dealing.

Given the foregoing rulings, the court will also allow

Defendants' motion with respect to Plaintiffs' claims for

breach of contract (Count II) and breach of the covenant of

good faith and fair dealing (Count III).  It is true, as

Plaintiffs point out, that a malpractice claim may not

"sound exclusively in either contract or tort."  Clark v.

Rowe, 701 N.E.2d 624, 341 (Mass. 1998).  Yet, while this

principle gives plaintiffs a degree of flexibility in

constructing their pleadings, courts must ultimately address the merits of a case based on substance, rather than form. See McStowe v. Bornstein, 388 N.E.2d 674, 677 (Mass. 1979).

"Negligence in the manner of performing [a contractual duty] as distinguished from mere failure to perform it, causing damage, is a tort." Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 788 N.E.2d 522, 531 (Mass. 2003) (citation omitted). Here, the conclusion is inescapable that Plaintiffs seek damages based on the manner in which Defendants performed their accounting responsibilities, and it is well established that Massachusetts courts apply tort law to such claims, despite the fact that they arise from a contractual relationship. See id. (affirming summary judgment for defendant on claim alleging that insurer had breached policy by failing to provide a competent defense because the claim, "while arising out of the contract, is in essence a tort"); Thomas v. Mass. Bay Trans. Auth., 450 N.E.2d 600, 602 (Mass. 1983) (holding that "the essential nature of the plaintiff's claim is recovery for personal injuries founded on the MBTA's negligence").

Similarly, Plaintiffs' claims arise out of a

contractual relationship but, in essence, allege negligence in the performance of that contract. Beyond this, of course, both a tort and a breach of contract action require proof of damages, for which adequate supporting evidence is absent here. See Breyan v. Shagory, 944 N.E.2d 632, 2011 WL 1186277, at *1 n.3 (Mass. App. Ct. Mar. 31, 2011) (Table) (holding in legal malpractice action that "inadequate proof of the defendant's breach of duty and damages caused by the breach is also fatal to the plaintiff's breach of contract, breach of fiduciary duty, and G.L. c. 93A claims"); see generally Herbert A. Sullivan, Inc., 788 N.E.2d at 532 n.7 ("There is little practical difference between the elements of proof in a tort action for negligence and a contract action for the negligent provision of legal services.").

E.    Count IV: Breach of Fiduciary Duty.

A fiduciary "is a person having a duty, created by his undertaking, to act primarily for the benefit of another in a matter connected with his undertaking." Patsos v. First Albany Corp., 719 N.E.2d 882, 886 (Mass. App. Ct. 1999) (quoting Restatement (Second) of Agency § 13, comment a (1958)). While certain relationships, such as the attorney-

client relationship, are always fiduciary in nature, the question of whether an accountant owes a fiduciary duty to his or her client depends on the facts of the case. <u>See</u> <u>Fleet Nat. Bank v. H&D. Entertainment, Inc.</u>, 926 F. Supp. 226, 242 (D. Mass. 1994), <u>aff'd</u> 96 F.3d 532 (1st Cir. 1996). Generally, an accountant-client relationship does not create such obligations. <u>Id.</u> (collecting cases).

> The weight of legal precedent -- and common sense -- stands for the proposition that an accountant takes on fiduciary obligations only where he or she 'recommend[s] transactions, structure[s] deals, and provide[s] investment advice' . . . such that he or she exercises some managerial control over the assets in question.

<u>Id.</u> (quoting <u>Martin v. Feilen</u>, 965 F.2d 660, 669 (8th Cir. 1992)); <u>accord</u> <u>Vasquez v. Potter & Co., Inc.</u>, No. 9999, 2007 WL 959538, at *3 (Mass. App. Div. Mar. 28, 2007).

Plaintiffs make no allegations that Defendants exercised managerial control over their assets. Thus, no fiduciary relationship exists, and the court will allow Defendants' motion as to Count IV. Moreover, Defendants would be entitled to summary judgment for all the reasons previously stated in any event.

F.   <u>Count V: Negligent Misrepresentation</u>.

Massachusetts has adopted the Restatement's approach to tort liability in this area.

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Nycal Corp. v. KPMG Peak Marwick LLP, 688 N.E.2d 1368, 1371 (Mass. 1998) (quoting Restatement (Second) of Torts § 552(1)). Because this count, like Count I, requires proof of damages and a failure to exercise reasonable care, it fails for the reasons discussed above.

Moreover, the tort of negligent misrepresentation imposes on plaintiffs the additional requirement of putting forth evidence of falsity. See Nycal Corp., 688 N.E.2d at 1371. Plaintiffs do not point to any even allegedly false statement made by Defendant Helming regarding the Loan to Officer issue in 2004 and 2005, including the 2005 side letter, which formally outlined Defendant Helming's position on the matter. Rather, Plaintiffs highlight broad statements made by Defendant Helming in an email to Sera

56

Daemi in 2008 and in Defendants' answers to interrogatories in this litigation. (See Dkt. No. 29, Ex. D, Helming emails ("An S Corporation cannot have advances or officer's loans to shareholder."); Dkt. No. 29, Ex. F, Defendant's Resp. to Int., No. 10 ("There is no provision in the US Tax Code for Shareholders in a sub S corporation, other than a bank, to maintain loans to shareholders.").) Plaintiffs have not shown these statements to be false.[12] Moreover, these statements were made years after the events at issue here, thus preventing Plaintiffs from proving another essential element of their claim: reliance.

In sum, Plaintiffs cannot establish falsity, reliance, the failure to exercise reasonable care, or damages, and this court will therefore allow Defendants' motion as to

_____

[12] Plaintiffs reason that because these are factual assertions and because their expert "clearly opined that this advice was improper," they constitute false statements of fact. (Dkt. No. 26, Pls.' Opp'n at 36.) Although creative, this argument is obviously unsound. As explained thoroughly in the text, Plaintiffs' expert did not challenge the substance of Defendant Helming's position on the Loan to Officer issue, but rather attacked his strategic decision to immediately amend the 2002 tax returns instead of simply ignoring the issue or dealing with it "on a prospective basis." (Dkt. No. 22, Ex. 50, Aptaker Rep. at 9.) This disagreement, of course, does not bear on the truth or falsity of the statements cited.

Count V.

G.  Count VI: Violation of Mass. Gen. Laws ch. 93A.

Chapter 93A provides a cause of action to "a person who is engaged in business and who suffers a loss as a result of an unfair or deceptive act or practice by another person also engaged in business." Manning v. Zuckerman, 444 N.E.2d 1262, 1264 (Mass. 1983) (citation omitted).  Negligence is not a sufficient basis for a 93A claim; something more is required.  See Darviris v. Petros, 812 N.E.2d 1188, 1192 (Mass. 2004) ("[A] violation of G.L. c. 93A requires, at the very least, more than a finding of mere negligence."); Poly v. Moyland, 667 N.E.2d 250, 257 (Mass. 1996), cert. denied, 519 U.S. 1114 (1997) (negligent representation by attorney did not violate Chapter 93A where attorney "did not engage in conduct involving dishonesty, fraud, deceit or misrepresentation").

Here, Plaintiffs have failed to put forth sufficient evidence even of negligence, let alone the kind of dishonesty, fraud, deceit, or misrepresentation required to establish a claim under Chapter 93A.  Therefore, the court will allow Defendants' motion as to Count VI.

## IV. CONCLUSION

It is surprising that Plaintiffs had the temerity to bring this lawsuit. The complaint was clearly filed too late. The record, mainly as a result of Plaintiffs' failure to file long-overdue tax returns, is utterly insufficient to demonstrate damages. Most importantly, it is clear that Plaintiffs for many years enjoyed over $1,000,000 in income without paying any taxes on it, and they accomplished this by filing a tax return that improperly characterized the monies they received as a loan. It is close to ludicrous to claim that, by advising Plaintiffs to amend the 2002 tax return to conform with what the law and good accounting practice required, Defendants were being negligent. On the contrary, they were serving their clients ethically and well.

As a result of behaving professionally, Defendants have found themselves slapped with this expensive lawsuit. That undeserved headache, at least, is now over. The court can only hope that the IRS and the state authorities will make sure that Plaintiffs now proceed to do what everyone who enjoys the privilege of living in our beloved country is

required to do: pay their fair share of taxes.

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. No. 22) is hereby ALLOWED, and Plaintiffs' Motion for Leave to File Sur Reply (Dkt. No. 33) is hereby DENIED.  The clerk will enter judgment for Defendants.  The case may now be closed.

It is So Ordered.

 /s/ Michael A. Ponsor
MICHAEL A. PONSOR
Senior U.S. District Judge